**Case No. 23-3220**

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

SEMA'J GRIFFIN,

Plaintiff-Appellant

v.

LLOYD AUSTIN, SECRETARY OF DEFENSE

Defendant-Appellee

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

---

**BRIEF OF PLAINTIFF-APPELLANT**
**Oral Argument Requested**

---

Plaintiff-Appellant's Counsel:

Gary A. Reeve (0064872)
5354 Cemetery Road
Hilliard, Ohio 43026
Ph.: (614) 808-1881
Fax: (614) 334-5107
*greeve@reevelaw.net*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 23-3220_____    Case Name: Griffin v. Austin_____

Name of counsel: Gary A. Reeve_____

Pursuant to 6th Cir. R. 26.1, Plaintif-Appellant SeMa'J Griffin_____
                                         *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
       identity of the parent corporation or affiliate and the relationship between it and the named
       party:

No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
       in the outcome?  If yes, list the identity of such corporation and the nature of the financial
       interest:

No

CERTIFICATE OF SERVICE

I certify that on _____April 24, 2023_____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Gary A. Reeve_____
_____
_____

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

**<u>TABLE OF CONTENTS</u>**

Table of Authorities                                                                                         V

I.  Statement in Support of Oral Argument                                                  1

II.  Jurisdictional Statement                                                                           1

III.  Statement of the Issues for Appeal                                                         1

IV.  Statement of the Case                                                                             2

V.  Statement of the Facts                                                                            2

    A. Griffin began his employment with Defendant-Appellee in May
       2019.                                                                                                    2

    B. DLA lacked any training program or structure for Griffin to be
       judged on.                                                                                            3

    C. Griffin's ADHD affected his workplace behavior and caused
       him to become an immediate target for Souvannavong's
       excessive scrutiny.                                                                              4

    D. Griffin was directed by Swiggum to access DLA's reasonable
       accommodation process but was stymied by its procedures and
       obstacles created by the COVID pandemic.                                        6

    E. Griffin reasonably reported being targeted by Souvannavong
       early on in his employment.                                                                7

    F. Griffin had issues with time reporting and policies but adjusted
       reasonably quickly to resolve those issues.                                     8

    G. Souvannavong exhibited ferocity and persistence in pursuing
       Griffin's removal from her Branch.                                                   9

    H. Griffin's last Quarterly Report before discharge was positive
       and showed improvement in all areas.                                           11

I.  Souvannavong's supervisor, at Souvannavong's behest, sent an email that was in stark contrast to Griffin's last QR and asked for Griffin's removal from the area.                                    12

J.  The information sent to the final decision maker appeared deliberately skewed and incomplete in a way that assured a negative outcome.                                                              13

VI.  Summary of the Argument                                                              15

VII.  Standard of Review                                                                  16

VIII.  Law and Argument – A reasonable jury could decide that Griffin should prevail on his claim for disability discrimination under the Rehabilitation Act.                                                   16

A. Griffin was "disabled" under the statute.                                              17

B. Griffin was qualified to perform the position with or without a reasonable accommodation.                               17

C. Griffin was discharged solely because of his disability and there is direct evidence of that being true.                              19

D. The alleged legitimate non-discriminatory reasons set forth by DLA are pretextual, leaving Griffin's disability as the sole reason for discharge.                                                               23

1.  Griffin's ability to perform his job tasks was adequate for a Student Intern.                                               24

2.  The time recording issue was de minimus and quickly corrected in every case, and Griffin never "stole time."                 25

3.  It is unfair and unlawful to determine that Griffin did not seek a reasonable accommodation as the only delays to his request were DLA's procedural rules and obstacles created by the COVID pandemic.                                                       26

IX.  Conclusion                                                                27

X.  Certificate of Service                                                     28

XI.  Certificate of Compliance                                                 28

Designation of Relevant District Court Documents

## <u>TABLE OF AUTHORITIES</u>

**Statutes and Regulations:**

42 U.S.C. § 12102(3)                                                                17

42 U.S.C. § 12111(8)                                                                17

29 C.F.R. § 1630.2(m)                                                               17

**Cases:**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)                              16

*Bent-Crumbley v. Brennan*, 799 F.App'x 342, 345 (6th Cir. 2020)                    17

*Celetox Corp. v. Catrett*, 477 U.S. 317 (1986)                                     16

*EEOC v. C.R. England Co.,* 644 F.3d 1028 (10th Cir. 2011)                          27

*Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir. 1985)          20-21

*Longstreet v. Ind. Comm. of Ohio,* Case No. 1:14 CV 2619 (N.D.Ohio May 12, 2015)   27

*McNabola v. Chicago Transit Authority*, 10 F.3d 501 (7th Cir.1993)                 23

*Manzer v, Diamond Shamrock Chem., Co.*, 29 F.3d 1078 (6th Cir. 1994)               23

*Mestas v. Town of Evansville*, Case No. 17-8092 (10th Cir. Sept. 6, 2019)          27

*Mitchell v. U.S. Postal Service*, 738 F.App'x 838 (6th Cir. 2018)                  23

*Reeves v. Sanderson Plumbing Prods., Inc.*, 533 U.S. 133 (2000)                    16

*Roebuck v. Summit Cty. Dept. of Job and Family Servs*, Case No.
5:13 CV 2816 (N.D.Ohio May 30, 2014)                                    27

*Smith v. Henderson*, 376 F.3d 529 (6th Cir. 2004)                       27

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)                            22

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989)           16

## I.  Statement in Support of Oral Argument

Plaintiff-Appellant SeMa'j Griffin ("Griffin") asserts that the Trial Court engaged in an improper weighing of evidence and credibility to erroneously downplay evidence of discrimination and decide against this being a direct evidence case, meaning oral argument would be crucial to carefully discuss and consider these issues.

## II.  Jurisdictional Statement

The instant case, as appealed, addresses matters of federal law under the Rehabilitation Act, and was in the District Court pursuant to subject matter jurisdiction.  Appellate jurisdiction is proper due to the Trial Court's rendering of a final appealable order dismissing Griffin's claim pursuant to its decision granting the Motion for Summary Judgment of Defendant-Appellee Lloyd Austin, Secretary of Defense ("Austin"). (R.37 Opinion and Order, PageID # 1573-1592; R.38 Judgment Entry, PageID # 1593)  Griffin timely appealed against Austin as a matter of right.

## III.  Statement of the Issues for Appeal

A.  The Trial Court erred in deciding there was no and/or insufficient direct evidence of discrimination; and,

B.  The Trail Court erred in deciding that Appellee was entitled to summary judgment on Appellant's disability discrimination claim.

## IV.  Statement of the Case

The case at the Trial Court level eventually relied upon the Amended Complaint filed on November 23, 2011, as altered by a subsequent Motion. (see R.12 Amended Complaint, PageID # 79-83; R.24 Stipulation and Motion for Partial Motion of Dismissal, PageID # 114-117; R.25 Order Granting Motion, Page ID # 118)  This left only Griffin's claim against Austin for disability discrimination under Rehabilitation Act to be ruled upon by the Trial Court.  The trial Court granted Austin's Motion for Summary Judgment on March 9, 2023. (R.37 Opinion and Order, PageID # 1573-92; R.38 Judgment Entry, PageID # 1593)  Griffin filed his Notice of Appeal timely later in the day on March 9, 2023. (R.39 Notice of Appeal, PageID # 1594)

## V.  Statement of the Facts

### A. Griffin begins his employment with Defendant-Appellee in May 2019.

Griffin began his employment with Defense Logistics Agency ("DLA") as a Student Intern on May 19, 2019. (R.27 Koukourakis TR 11, PageID # 1073) Student Interns are brought to work at the DLA facility in Columbus while they are pursuing their college degrees with the hope that they can be trained into

permanent positions when they achieve their degrees. (R.27 Koukourakis TR 8, PageID # 1070)  This is called progressing into the Pathways to Career Excellence ("PACE") program, and the employees in that program are called PACERS. (R.27 Koukourakis TR 7-8, PageID # 1069-70)  It is presumed that the Interns know little if anything about the job when they begin. (R.29 Swiggum TR 8, PageID # 1190)  Griffin was in classroom lectures for the first weeks of his employment. (R.26 Griffin TR 32, PageID # 149)  He was deployed "to the floor" to start performing actual work tasks on August 19, 2019, in the Quality Management ("QM") area under the daily direct supervision of Supervisory Customer Relations Specialist Michael Swiggum ("Swiggum"). (R.29 Swiggum TR 7, Page ID # 1189; R.26 Griffin TR 49-50, 53, PageID # 166-67, 170)  Swiggum reported directly to QM Branch Chief Sally Souvannavong ("Souvannavong"). (R.27 Koukourakis TR 10-11, PageID # 1072-73)  When Swiggum was off work for any reason, Griffin would report to Derrick Dobbins ("Dobbins") who held the same position as Swiggum for another team. (R.26-3 Dobbins Aff. Ex. 1-3, p. 546-47, PageID # 912-13)

**B. DLA lacked any training program or structure for Griffin to be judged on.**

There was no training program set up in QM for Griffin. (R.27 Koukourakis TR 36, PageID # 1098; R.29 Swiggum TR 20, PageID # 1202; R.26 Griffin TR

135-36, PageID # 152-53)  This was an oversight that was to have been corrected

previously, but no action had yet been taken. (R.27 Koukourakis TR 36-37,

PageID # 1098-99)  Instead, Griffin was given the menial task of reviewing "NIN"

spreadsheets, changing one designation where necessary from "CJ" to "CY" and

noting the reason for any change. (R.29 Swiggum TR 21, PageID # 1203; R.26

Griffin TR 54, 67, PageID # 171, 184)  Swiggum gave Griffin very minimal

training in this task, and it became almost the sole work Griffin performed every

day for eight (8) months. (R.26 Griffin TR 54, PageID # 171)  Griffin repeatedly

asked to be taught other tasks or areas and was given virtually no such training or

opportunities. (R.26 Griffin TR 138, 142, PageID # 255, 259)

### C. Griffin's ADHD affected his workplace behavior and caused him to become an immediate target for Souvannavong's excessive scrutiny.

In Griffin's first couple of weeks on the floor, Swiggum noticed that Griffin

would get up out of his seat often, and that his attention appeared to wander during

times he trained him.  (R.29 Swiggum TR 10-12, PageID # 1192-93)  Swiggum

went to Career Program Specialist for the Student Intern Program Craig White

("White") to discuss these behaviors. (R.29 Swiggum TR 10-12, PageID # 1192-

93; R.27 Koukourakis TR 9, PageID # 1071)  It was known by Swiggum that

White was engaged to Griffin's mother, and that White and Griffin lived in the

same house, giving White potentially greater insight into Griffin's behaviors. (see

R.29 Swiggum TR 30, PageID # 1212; R.26 Griffin TR 117, PageID # 234)  White
reported to Swiggum that Griffin suffered from Attention Deficit Hyperactivity
Disorder ("ADHD") and Tourette's Syndrome. (R.29 Swiggum TR 10-12, PageID
# 1192-93)  The same day after meeting with White, Swiggum reported Griffin's
ADHD and Tourette's to Souvannavong, who immediately said, "I don't want that
in my department." (R.29 Swiggum TR 12-13, PageID # 1194-95)
Souvannavong's claim that she made that statement regarding overall performance
is not credible, given Swiggum's testimony that her reaction was immediate, and
the fact Griffin had only been on the floor a few weeks. (see R.28 Souvannavong
TR 9-10, PageID # 1142-43; R.29 Swiggum TR 12-13, PageID # 1194-95)
Souvannavong then outlined to Swiggum a demand to subject Griffin to intensive
scrutiny as to his use of time and the accuracy of the performance of his duties
with the purpose of getting him out of the department. (R.29 Swiggum TR 13-14,
PageID # 1195-96)  Souvannavong had Griffin's workstation moved to right
outside of her door so that she could personally monitor and intimidate him. (R.27
Koukourakis TR 23-24, PageID # 1085-86)  Swiggum went on paternity leave for
a time during which Souvannavong demanded that Griffin email her when he came
in and when he left, as well as periodically throughout the day as to what work he
was performing. (R.29 Swiggum TR 15, PageID # 1197). This emailing request
was so far outside the norm for job scrutiny that when HR found out about it

Souvannavong was ordered to immediately cease the requirements. (R.29 Swiggum TR 15, PageID # 1197)  Souvannavong then wanted Swiggum to engage in the same program of emails she had been stopped from performing when he returned from leave. (R.29 Swiggum TR 15-16, PageID # 1197-98)

   **D. Griffin was directed by Swiggum to access DLA's reasonable accommodation process but was stymied by its procedures and other obstacles created by the COVID pandemic.**

   For his part, Swiggum informed Griffin of DLA's reasonable accommodations office and procedures and ordered paperwork to be given to Griffin to apply for protection regarding his sometimes paripatetic nature. (R.29 Swiggum TR 13, PageID # 1195)  Griffin had been diagnosed with his conditions at the age of four (4) and had found coping mechanisms for them without medications since the middle of high school. (R.26 Griffin TR 111-16, PageID # 228-33)  Griffin submitted a letter from his family doctor but was told that was not enough. (R.26 Griffin TR 119-22, PageID # 236-40)  Griffin was then referred to a psychiatrist who stated he would need multiple appointments (10) to properly assess Griffin's conditions so as to recommend accommodations. (see R.26 Griffin TR 198, PageID # 323)  Griffin began attending appointments in October 2019 and kept management aware of his progress. (R.29 Swiggum TR 39, PageID # 1221; R.27 Koukourakis TR 16, PageID # 1078)  He was unable to complete all the necessary appointments until the beginning of the COVID shutdowns in March

2020, and his psychiatrist did not complete and submit his report to DLA until after Griffin was already removed. (R.26 Griffin TR 124-26, PageID # 241-43)

### E. Griffin reasonably reported to Koukourakis being targeted by Souvannavong early on in his employment.

White voluntarily exempted himself from any decision-making supervisory activity regarding Griffin because of their familial connection. (R.29 Swiggum TR 30, PageID # 1212) This meant that Griffin's direct supervisor for his Student Intern Program (not his floor supervisor, who was Swiggum) was Career Program Specialist for the PACE Program George Koukourakis ("Koukourakis"). (R.27 Koukourakis TR 7, Page ID # 1069) On September 10, 2019, Griffin met with Koukourakis to report that he felt he was being targeted for removal by Souvannavong and maybe Swiggum. (see R.26-2 Ex. 1, p. 408, PageID # 774) Koukourakis detailed Griffin's feelings in a lengthy email to Souvannavong and Swiggum that same day. (R.26-2 Ex 1, p. 408, PageID # 774) He instructed the two supervisors that Griffin, as a Student Intern, was expected to initially lack job-related knowledge. (R.26-2 Ex 1, p. 408, PageID # 774) He urged the two to provide mentorship for Griffin and a greater variety of experiences to both enrich Griffin's experience as well as challenge Griffin to learn. (R.26-2 Ex 1, p. 408, PageID # 774) Swiggum felt Griffin was justified in his feelings of being targeted. (R.29 Swiggum TR 49, PageID # 1231) After Swiggum returned from paternity

7

leave, Souvannavong told Swiggum that Griffin had accused Swiggum of race and disability discrimination, an accusation Swiggum doubted and eventually found Griffin had never made, i.e., Souvannavong lied to Swiggum to attempt to bias him against Griffin. (R.29 Swiggum TR 58-60, PageID # 1240-42)  In the end, Swiggum acknowledged that no real action was taken in response to Koukourakis' email. (R.29 Swiggum TR 52, PageID # 1234)  Swiggum also clearly stated that he did not have the time to properly act as Griffin's mentor, as requested by Koukourakis. (R.29 Swiggum TR 52, PageID # 1234)  In one cryptic statement in Koukourakis' email, Koukourakis stated, "If this approach isn't acceptable to you both, then I'll pursue the other course we discussed yesterday and remove Sema'J from your team." (R.26-2 Ex 1, p. 408, PageID # 774)  This was at a time that Swiggum stated he had advocated for Griffin to stay with the team, so this must have meant that Souvannavong (the only other email recipient) had advocated for that outcome. (see R.29 Swiggum TR 19-20, 36,  PageID # 1201-02, 1218)

### F. Griffin had issues with time reporting and policies but adjusted reasonably quickly to resolve those issues.

Griffin had exhibited problems with DLA's work time reporting system. One of the main problems was understanding "core hours," which for Griffin were 7:30 a.m.-3:30 p.m. daily.  (R.26 Griffin TR 155-56, PageID #  272-73)  While Griffin understood that he was to come in at a time of his choosing but not before

6:00 a.m. and to work eight (8) hours per day (with a half-hour lunch), he thought he could leave earlier than 3:30 p.m. if he came in early enough to get his eight (8) hours in. (R.25 Griffin TR 29-31, PageID # 146-48)  This problem was detected, brought to Griffin's attention, and corrected. (R.26 Griffin TR 155-56, PageID # 272-73)  Griffin also thought at one time he could work off the clock outside of normal work hours to catch up backlogged duties. (R.26 Griffin TR 156-57, 159, PageID # 273-74, 276)  Again, this was detected, brought to Griffin's attention, and corrected.  Finally, the nature of the Intern's advance time reporting was changed from a one-week to a two-week advance interval. (R.26 Griffin TR 163-64, PageID # 283-84)  Griffin had a little trouble adjusting to this initially, but quickly fell in step. (R.26 Griffin TR 163-64, PageID # 283-84)  At no time was Griffin ever accused of "stealing time." (R.27 Koukourakis TR 22, PageID # 1084) In fact, in this instance he was accused of wrongly working for free, i.e. giving away his time. (see R.26 Griffin TR 156-57, 159, PageID # 273-74, 276)

### G. Souvannavong exhibited ferocity and persistence in pursuing Griffin's removal from her Branch.

Griffin continued to be hectored to distraction by Souvannavong and other Customer Account Specialist ("CAS") employees enlisted by Souvannavong to watch his movements. (R.29 Swiggum TR 16, PageID # 1198; Griffin TR 75, 147, 153, PageID # 192, 264, 270)  Griffin could not leave his desk to get water or go to

the restroom without being asked by someone where he had gone and how long it had taken. (R.26 Griffin TR 75, 147, 153, PageID # 192, 264, 270)  To extend his time away from his desk, Griffin was told by Souvannavong that he could not use a nearby restroom, as that was a "privilege" he had not "earned." (R.26 Griffin TR 85-86, PageID # 202-03)  The situation was so oppressive that Griffin came to describe it as a "prison watch." (R.26 Griffin TR 78, PageID # 295)

Souvannavong continued to advocate Griffin's removal from the QM area to Swiggum and Dobbins starting at the 4-6 week point of Griffin's employment and continuing through the end of his employment. (R.28 Souvannavong TR 33-34, PageID # 1166-67)  Swiggum and Dobbins regularly defended Griffin demanding he be given a fair chance to succeed. (R.29 Swiggum TR 18-20, 36-37, 54, PageID # 1200-02, 1218-20, 1234)  At one point, Souvannavong asked for a statement from Swiggum to reassign Griffin and called him into a meeting and argued with him when he refused to write it, stating that from that moment forward she would provide no help to him regarding Griffin. (R.29 Swiggum 56-57, PageID # 1238-39)  Dobbins noted the unduly harsh and personal nature of Souvannavong's attacks on Griffin's work status as time went by. (R.26-3 Dobbins Aff. Q.28, Ex. 1, p. 551, PageID # 917)  Swiggum went to DiPaolo more than once to try and get him to intervene with Souvannavong on the issue but received no assistance. (R.29 Swiggum TR 16-17, PageID # 1198-99)  Swiggum and Dobbins went to White to

see if anything could be done, expressing that Souvannavong was "a discouraging factor" in Griffin completing his work. (R.29 Swiggum TR 62-64, PageID # 1246-48)  Koukourakis attested to the difficulty that a normal employee would have dealing with such harassment and intense scrutiny. (R.27 Koukourakis TR 41, PageID # 1102)  Dobbins described Griffin being subjected to a ridiculous environment of monitoring of his every move with no training. (R.26-3 Dobbins Aff. Q.29, Ex. 1, p. 551, PageID # 917)  Dobbins stated unequivocally that Souvannavong was responsible for Griffin's removal through false claims to upper management, and that Swiggum was only able to buy Griffin a couple of additional weeks at the end. (R.26-3 Dobbins Aff. Q.30, Ex. 1, p. 551, PageID # 917)

### H. Griffin's last Quarterly Report before discharge was positive and showed improvement in all areas.

Griffin was given his last Quarterly Report by Swiggum on July 15, 2020. (R.26-1 Ex. 1, p. 193-999, PageID # 559-65)  Griffin had been given three (3) prior such reports and had received "Needs Improvement" on the first two, and "Satisfactory" on the one prior to the last Report. (R.26-1 Ex. 1, p. 171-92, PageID # 537-558)  Griffin felt he received the one "Satisfactory" because during the bulk of that quarter he had been training away from Souvannavong. (R.26 Griffin TR 179, PageID # 296)  In the July 15, 2020, Quarterly Report Swiggum rated Griffin as acceptable in all general areas on the report that required a numeric response or

a "YES-NO" ratings. (R.26-1 Ex. 1, p. 195-96, PageID # 561-62)  Swiggum's
comments were generally complementary as to Griffin's improvement in prior
problem areas and his ability to complete his work with accuracy. (R.26-1 Ex. 1, p.
196-97, PageID # 562-63)  All witnesses (even Souvannavong) who were asked to
assess the review felt that it was a generally positive review. (R.27 Koukourakis
TR 33-35, 39-40, Page Id # 1097; R. 29 Swiggum 27-29, PageID # 1209-11; R.28
Souvannavong TR 22-23, PageID # 1145-46)

### I. Souvannavong's supervisor, at Souvannavong's behest, sends an email that is in stark contrast to Griffin's last QR and asks for Griffin's removal from the area.

On August 23, 2020, five (5) weeks after the July 15, 2020, Quarterly
Report, Souvannavong's supervisor Lt. Commander Ryan DiPaolo ("DiPaolo")
sent an email to Koukourakis in which he requested that Griffin be removed from
his Directorate. (R.31-1 Ex. 6, p. 3, PageID # 1326)  DiPaolo cited any and all
negative areas set forth in prior Quarterly Reports without providing said reports
and also without stating any of the positive areas and areas of improvement. (see
R.31-1 Ex. 6, p. 3, PageID # 1326)  Koukourakis was "taken aback" by the
difference in content and tone between Griffin's final Quarterly Report and
DiPaolo's email, believing it described a "whole different situation." (R.27
Koukourakis TR 40, PageID # 1102)  Koukourakis concluded from DiPaolo's
email that, "they just didn't want him on the team anymore.  Performance or non-

performance, it didn't matter." (R.27 Koukourakis TR 40, PageID # 1102)  The

events that led to this email are fuzzy, but it is clear that Souvannavong: (1)

demanded Swiggum provide a short statement to DiPaolo supporting Griffin's

*reassignment*, and that, (2) Souvannavong had one-on-one conversations with

DiPaolo regarding Griffin being removed from her area without Swiggum present.

(R.28 Souvannavong TR 25-27, PageID # 1158-60; R.29 Swiggum TR 24, PageID

# 1206)  Swiggum provided a generally negative statement, as requested, but

evidently felt that Griffin would be reassigned and not discharged. (R. 29 Swiggum

TR 24-25, PageID # 1206-07)  DiPaolo even suggested that reassignment might be

an option for Griffin. (see R.31-1 Ex. 6, p. 3, PageID # 1326; R.27 Koukourakis

TR 41, PageID # 1102)  Swiggum expressed the likelihood of reassignment to

Griffin a few days before the discharge. (R.29 Swiggum TR 23, PageID # 1205)

Swiggum noted Griffin's excitement at the prospect of reassignment, and that he

exhibited a "complete reversal" in attitude and had "more drive and effort" after

the conversation. (R.29 Swiggum TR 35, 61, PageID # 1217, 1243)

### J. The information sent to the final decision maker appeared deliberately skewed and incomplete in a way that assured a negative outcome.

Per normal procedure upon a request for removal from someone at Dipaolo's

level, Koukourakis put together a group of documents that was to have included

(1) a Staff Summary Sheet drafted by HR asking that the Chief of Staff (Col.

Samuel Payne ["Payne"]) take action, but not setting forth any particular action recommendation; (2) DiPaolo's request for removal from QM; (3) Griffin work status documents and job description: (4) a recommendation of action by HR; (5) all of Griffin's Quarterly Reports; and, (6) any disciplinary documents or other documents he felt should carry weight in the situation. (R.27 Koukourakis TR 25-26, PageID # 1087-88; see R.31-1 Ex. 6, *supra.*, PageID # 1324-86)  Payne was to then review this packet and make a decision as to reassignment or removal. (R.27 Koukourakis TR 25-26, PageID # 1087-88)

Payne's description of his review was that it was cursory at best.  Payne failed to notice that not all of Griffin's Quarterly Reports were in the packet. (R.31 Payne TR 18-19, PageID # 1309-10)  Notably missing was the one Quarterly Report on which Griffin had been termed "Satisfactory," and Payne stated that might have affected his decision had it been included. (R.31 Payne TR 18-19, PageID # 1309-10)  Payne reported essentially looking at only the final assessments on the Quarterly Reports and not the details and comments that would have painted a fuller picture. (R.31 Payne TR 16, PageID # 1307)  He acknowledged in testimony that, upon review, Swiggum's comments on the final QR were generally positive and should have carried some weight and acknowledged that "Needs Improvement" in and of itself was not a disqualifying rating. (R.31 Payne Tr 16, 18, Page ID # 1307, 1309)  The HR recommendation

14

was literally one non-descriptive sentence, which Payne never asked to be
illuminated by the reasoning behind it. (R.31-1 Ex. 6, p. 19, PageID # 1342; R.31
Payne TR 14, PageID # 1305)  Payne never talked to Koukourakis. (R.27
Koukourakis TR 29, Page ID # 1091)  Payne was not made aware of Griffin's
ongoing access to the reasonable accommodations process, and admitted it was a
"pretty large variable" and that he doesn't know how it might have affected his
decision had he known. (R.31 Payne TR 21, PageID # 1312)  In the end, Payne
blithely stated that "no decision ever comes with 100% of the information," and
that he trusted his subordinates to provide all of the "pertinent information." (R.31
Payne TR 20, 23-24, PageID # 1311, 1314-15)  Though DiPaolo had
recommended reassignment, Payne decided to remove Griffin totally from service.
(R.31 Payne TR 11, PageID # 1302)

## VI.  Summary of the Argument

Significant amounts of direct evidence of discrimination that led to Griffin's
discharge was set forth to the Trial Court at the summary judgment phase.  The
Trial Court chose to downplay that evidence and state that this was "not a direct
evidence case."  This was reversable harmful error.  The Trial Court also denied
the demonstrable ability of Griffin to prove to a reasonable jury that the reasons set
forth for discharge were pretextual in nature.  This was also reversable harmful

error.  The case dismissal must be vacated and sent back to the Trial Court for disposition.

## VII.  Standard of Review

Review of a summary judgment decision by this Court is a *de novo* review. Summary judgment is guided by the standard set forth in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986), and *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). When determining summary judgment, this Court must consider all evidence in the light most favorable to Griffin, as the non-moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 533 U.S. 133, 150 (2000).  However, in addition, the United States Supreme Court has noted that when determining whether to grant summary judgment, a reviewing court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 533 U.S. at 151.  Finally, the Court is also prohibited from weighing credibility determinations regarding such evidence. *Id.*

## VII.  Law and Argument - A reasonable jury could decide that Griffin should prevail on his claim of disability discrimination under the Rehabilitation Act.

The elements of a prima facie claim for disability discrimination under the Rehabilitation Act are (1) proof that the person is a disabled person under the law; (2) that he was a qualified to perform the position with or without a reasonable

accommodation; and, (3) proof of an adverse employment action based solely on his disabled status. *Bent-Crumbley v. Brennan*, 799 F.App'x 342, 345 (6th Cir. 2020). As explained below, a reasonable jury could decide that Griffin can meet those elements.

### A. Griffin was "disabled" under the statute.

Defendant admitted for purposes of summary judgment that Griffin had a disability. Griffin asserts that his ability to retain information, and to concentrate on learning any given task was affected by his ADHD, which could qualify him as being actually disabled. Griffin also asserts that Souvannavong's actions, coupled with Swiggum and Koukourakis' referring Griffin to DLA's reasonable accommodation process means that Austin at the very least perceived Griffin had a disability. Souvannavong's negative actions because of that perception qualify Griffin as "disabled," as his condition was neither transitory nor minor. see 42 U.S.C. § 12102(3).

### B. Griffin was qualified to perform the position with or without a reasonable accommodation.

The determination of whether an individual is qualified is determined by (1) whether the individual meets the necessary prerequisites for the job, such as education, training, experience, etc., and (2) whether the individual can perform the essential job functions with or without reasonable accommodation. see 42

U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m).  Griffin met the necessary prerequisites for his position, or he never would have been hired.  As explained in his positive Quarterly Report on July 15, 2020, Griffin could perform the essential job functions of his position. (R.26-1 Ex. 1, p. 171-92, PageID # 537-558)  In that Quarterly Report Swiggum rated Griffin as acceptable in all general areas on the report that required a numeric response or a "YES-NO" ratings. (R.26-1 Ex. 1, p. 195-96, PageID # 561-62)  Swiggum's comments were generally complementary as to Griffin's improvement in prior problem areas and his ability to complete his work with accuracy. (R.26-1 Ex. 1, p. 196-97, PageID # 562-63)  All witnesses who were asked to assess the review felt that it was a generally positive review. (R.27 Koukourakis TR 33-35, 39-40, Page Id # 1097; R. 29 Swiggum 27-29, PageID # 1209-11; R.28 Souvannavong TR 22-23, PageID # 1145-46)

Griffin was not removed from his position because of his college grade point average, and this should not have been a consideration used by the Court to determine him not to be qualified.  In fact, Griffin was never advised his grade college point average was a problem at any time.  He knew he was required to *graduate* with a cumulative 3.0 grade point average to become a PACER. (R.26 Griffin TR 24-25, 65, PageID # 141-42, 182)  He was not aware of a requirement to have that grade average at all times and there is no evidence that was true. (Id.) The "red herring" defense of lack of qualifications based on Griffin's GPA is

therefore speculative, as there is no reason to believe Griffin could not have achieved a 3.0 GPA by the time he would have graduated his college program.

Griffin was not perfect, and no one is suggesting he was. Swiggum stated there was still room for improvement as "[h]e was still an intern." (R.29 Swiggum TR 28, PageID # 1210) Griffin's learning was a little slower and he needed more repetition than the average employee, but he was proficient not just in the basic "CJ/CY" duties he was given for eight (8) months, but also in any other duties given him. (see R.29 Swiggum TR 22, PageID # 1204) Though Griffin was seeking a reasonable accommodation of a few more breaks during his work shift, he was able to perform the duties well enough to be considered a "qualified individual" under the statute. (see R.26 Griffin TR 126-27, PageID # 243-44)

### C. Griffin was discharged solely because of his disability and there is direct evidence of that being true.

The Trial Court chose to believe Souvannavong's version of both her intentions and her actions, even when, as demonstrated above, her version was contradicted by other employees of DLA. Souvannavong's whitewashed version of events need not be believed by a jury. *Reeves*, 533 U.S. at 151. Instead the evidence shows that from the moment she found out Griffin had ADHD, Souvannavong targeted him for removal by stating, "I do not want that in my department." (R.29 Swiggum TR 12-13, PageID # 1194-95) "[H]arassment

directed at an employee by a single supervisor can sufficiently poison the employee's working atmosphere, since a supervisor can dominate the workplace with respect to his subordinate." *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250, 1260 (6th Cir. 1985).  Souvannavong's persistent actions were designed to harass and discourage Griffin and to effect Griffin's removal throughout his short employment by,

(1) exercising harassing and undue scrutiny herself and using others to assist her in that activity; (R.29 Swiggum TR 16, PageID # 1198; Griffin TR 75, 78, 85-86, 147, 153, PageID # 192, 195, 202-03, 264, 270 78, PageID # 295)

(2) intimidating Griffin by placing him right outside her door; (R.27 Koukourakis TR 23-24, PageID # 1085-86)

(3) harassing Griffin's immediate supervisors to write him up and ask for his removal to the point where it seemed to become a personal vendetta; (R.29 Swiggum TR 13-14, 18-20, 36-37, 54, 56-57, PageID # 1195-96, 1200-02, ,1218-20, 1234, 1238-39; R.26-3 Dobbins Aff. Q.28, Ex. 1-3, p.551, PageID # 917; R.28 Souvannavong TR 33-34, PageID # 1166-67)

(4) directly harassing Griffin with requirements so onerous that she was ordered to stop by HR, then trying to have Swiggum take up the same actions; (R.29 Swiggum TR 15-16, PageID # 1197-98) and,

(5) acting directly upon Swiggum, then Ryan DiPaolo to write statements that made it seem as if Griffin's performance didn't matter in their desire to have him removed  as the statements were the opposite of Griffin's Quarterly Report given a mere five (5) weeks before. (R.27 Koukourakis TR 40, PageID # 1102; R.28 Souvannavong TR 25-27, PageID # 1158-60; R.29 Swiggum TR 24, PageID # 1206)

Souvannavong's actions were so discouraging to Griffin that he perked up noticeably the moment Swiggum told him he would likely be reassigned away from her. (R.29 Swiggum RR 23, 35, 61, PageID # 1205, 1217, 1243)  Defendant has acknowledged that the amount of harassment dished out by Souvannavong would naturally make it harder for any normal employee to complete their work. (R.29 Swiggum TR 62-64, PageID # 1246-48; R.26-3 Dobbins Aff. Q.29, Ex 1-3, p. 5551, PageID # 917; R.27 Koukourakis TR 41, PageID # 1102)  Souvannavong was the supervisor that "poisoned the atmosphere in the workplace" for Griffin and dominated the workplace against his interests. see *Erebia*, at 1260.  All of this constitutes direct evidence of unlawful discrimination by the person to whom Griffin's supervisor directly reported, and who Griffin was forced to sit right outside her office.

While Souvannavong was not the final decision maker in this scenario, she pulled the strings and manipulated the players and eventually accomplished the

deed.  This case exemplifies the cat's paw theory of discrimination. *Staub v. Proctor Hosp.*, 562 U.S. 411, *supra.* (2011).  Souvannavong damaged Griffin's ability to work and put constant pressure on Swiggum and Dobbins to write Griffin up to support removal, and when they sought help from others in management to stop this activity that help was not forthcoming. (see R.29 Swiggum TR 16-17, 62-64, PageID # 1198-99, 1246-48)  Souvannavong directly influenced DiPaolo to write an email she knew Koukourakis would be forced to act upon, even though the content of the email was in direct contrast to the extremely recent Quarterly Report issued on Griffin. (R.28 Souvannavong TR 25-27, PageID # 1158-60; R.29 Swiggum TR 24, PageID # 1206)  Having set all of this in motion, Souvannavong would reasonably have felt safe in the likelihood that Griffin would be removed from her Branch.  Lt. Cmdr. DiPaolo, then Col. Payne, were Souvannavong's "cat's paws."  That Griffin was discharged rather than being reassigned may not have been an inevitability, but the danger Souvannavong placed him in caused it to be a definite and likely possibility.  Had Griffin not been identified to Souvannavong as suffering from ADHD, she would not have targeted him for removal, i.e., the process to remove him would never have started.  Had Souvannavong not targeted Griffin in the manner described above, he would not have been discharged.

**D. The alleged legitimate non-discriminatory reasons set forth by DLA are pretextual, leaving Griffin's disability as the sole reason for discharge.**

Griffin can prove to a reasonable jury that he was discharged solely because of his disability by proving that the reasons set forth by Defendant were pretextual under the *Manzer* test.  He can prove pretext by proving "'(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.'" *Manzer v, Diamond Shamrock Chem., Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), quoting *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir.1993) (emphasis added and quotation marks omitted).  Griffin "must only prove enough to create a genuine issue as to whether the rationale is pretextual." *Mitchell v. U.S. Postal Service*, 738 F.App'x 838, 847 (6th Cir. 2018).

Absent Souvannavong's vendetta against Griffin which was fueled by her knowledge of his disability, Griffin would never have been treated in the highly scrutinized manner described above.  While it may be true that Souvannavong used the reasons stated by DLA to pillory Griffin every chance she got, the only reason she acted in that manner was her aversion to his disability.  Griffin committed no egregious willful act that would reasonably be a legitimate non-discriminatory superseding cause for discharge.  Griffin was trying his hardest and not committing any willful violations right through to the end of his employment.  With

Souvannavong's discrimination as the root cause and driving force of the highly oppressive atmosphere that inflated DLA's reasons into something allegedly dischargeable, a reasonable jury could reach the conclusion that the sole reason Griffin was discharged was due to his disability.

### 1.  Griffin's ability to perform his job tasks was adequate for a Student Intern.

In the July 15, 2020, Quarterly Report, Swiggum rated Griffin as acceptable in all general areas on the report that required numeric or "YES-NO" ratings. (R.26-1 Ex. 1, p. 195-96, PageID # 561-62)  Swiggum's comments were generally complementary as to Griffin's improvement in prior problem areas and his ability to complete his work with accuracy. (R.26-1 Ex. 1, p. 196-97, PageID # 562-63) All witnesses who were asked to assess the review felt that it was a generally positive review. (R.27 Koukourakis TR 33-35, 39-40, Page Id # 1097; R. 29 Swiggum 27-29, PageID # 1209-11; R.28 Souvannavong TR 22-23, PageID # 1145-46)  Swiggum explained his "needs improvement" rating in his deposition as follows:

> 12  Q. Towards the bottom of this page, you say
> 13  there is a still room for improvement in all areas
> 14  with more focus needed on processing BZ/Norm actions.
> 15  Correct?
>
> 16  A. Yes.
>
> 17  Q. Did you consider that to be acceptable to

18   you for a college intern, still room for improvement?

19   A. To be acceptable?

20   Q. Yes.

21   A. I mean, yeah. He's still in the training
22   position.

(R.29 Swiggum TR 28, Page ID # 1210)  Col. Payne also explained that a "needs

improvement" rating on a Quarterly Review was not automatically disqualifying to

a candidate. (R.31 Payne TR 18-19, PageID # 1309-10)  Swiggum acknowledged

Griffin's success performing a greater variety of tasks, as well. (R.29 Swiggum TR

22, PageID # 1204)  Simply put, Griffin could and did adequately perform the job

of a Student Intern.

### 2.  The time recording issue was de minimus and quickly corrected in every case, and Griffin never "stole time."

The "core hours" problem was detected, brought to Griffin's attention, and

corrected. (R.26 Griffin TR 155-56, PageID # 272-73)  Griffin also thought at one

time he could work off the clock outside of normal work hours to catch up

backlogged duties. (R.26 Griffin TR 156-57, 159, PageID # 273-74, 276)  Again,

this was detected, brought to Griffin's attention, and corrected.  Finally, the nature

of the Intern's advance time reporting was changed from a one-week to a two-

week advance interval. (R.26 Griffin TR 163-64, PageID # 283-84)  Griffin had a

little trouble adjusting to this initially, but quickly fell in step. (R.26 Griffin TR

163-64, PageID # 283-84)  At no time was Griffin ever accused of "stealing time."

(R.27 Koukourakis TR 22, PageID # 1084)  In fact, in the instance of working off

the clock, he was accused of wrongly working for free, i.e. *giving away* his time.

(see R.26 Griffin TR 156-57, 159, PageID # 273-74, 276).  These issues were de

minimus, at worst, and therefore insufficient to warrant discharge.  In addition,

Griffin was not accused of any wrongdoing for personal gain.

### 3. It is unfair and unlawful to determine that Griffin did not seek a reasonable accommodation as the only thing that delayed his request was DLA's procedural rules and obstacles created by the COVID pandemic.

Griffin sought reasonable accommodation regarding his "time out of the

chair" issue.  He started the process with a form and a letter from his treating

physician but was told that he had not provided enough medical information. (R.26

Griffin TR 122-23, PageID # 239-40). Griffin could not accomplish the necessary

doctor's appointments within the 45-day window provided for by Defendant, and

therefore had to start the process again. (R.26 Griffin TR 123, PageID # 240)  He

was about to wrap up all the appointments his doctor felt necessary to issue a

report when COVID restrictions hit, and his doctor's office shut down. (R.26

Griffin TR 124, PageID # 241). The doctor finally issued a report, but it came to

DLA after Griffin had already been discharged. (R.26 Griffin TR 125, PageID #

242)

The prior story is meant to demonstrate that (1) Griffin diligently sought a reasonable accommodation; and, (2) he was frustrated in that attempt by DLA's rules and the obstacles created by the COVID pandemic.  It is arguable that DLA should have acted upon Griffin's initial request, as "[t]o properly request a reasonable accommodation, [Griffin] need not use any 'magic words,' like accommodation, disability, or ADA; however, [he] must tie the request, in context, to [his] existing medical restrictions." *Longstreet v. Ind. Comm. of Ohio,* Case No. 1:14 CV 2619, *5 (N.D.Ohio May 12, 2015), citing  *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004), see also *Roebuck v. Summit Cty. Dept. of Job and Family Servs*, Case No. 5:13 CV 2816, *5 (N.D.Ohio May 30, 2014), citing *Smith v. Henderson*; see also *Mestas v. Town of Evansville*, Case No. 17-8092, *7-8 (10th Cir. Sept. 6, 2019), citing *EEOC v. C.R. England Co.,* 644 F.3d 1028, 1049 (10th Cir. 2011).  Griffin had his doctor verify his ADHD condition and was simply trying to pursue the ability to take more frequent breaks to deal with his antsiness and satisfy those who did not understand why he got up and stretched his legs more often than others. (R.26 Griffin TR 126-27, PageID # 243-44).  DLA made him jump through major hoops to try to accomplish a small accommodation.

## IX.  Conclusion

Griffin's disability was the sole reason why he found himself subjected to removal by DLA.  There was significant direct evidence of discrimination by his

second level supervisor that caused the discharge.  A reasonable jury could find the alleged legitimate non-discriminatory reasons set forth by DLA to be pretextual, leaving nothing but Griffin's disability as the reason for discharge.  The Trial Court's Opinion and Order granting Austin's Motion for Summary Judgment, and the Judgment itself, must be VACATED and the case returned to the Trial Court for a trial by jury.

## X.  Certificate of Service

I hereby certify that the foregoing Appellant's Brief was filed via the Court's ECF system, and thereby served upon opposing counsel electronically on April 24, 2023.

## XI.    Certificate of Compliance

I certify that the foregoing Brief of Griffin complies with the type-volume limitations of F.R.Apx.P. 32(a)(7)(B).  The text of the brief (exclusive of the Table of Contents, Table of Authorities, and Statement In Support of Oral Argument) contains 6,487 words in a proportional typeface.  **I declare that the foregoing Certificate is true to the best of my information, knowledge, and belief.**

Respectfully Submitted,


s/ Gary A. Reeve
Gary A. Reeve (0064872)
Attorney for Plaintiff-Appellant
5354 Cemetery Road
Hilliard, Ohio 43026
Ph.: (614) 808-1881
Fax: (614) 334-5107
*greeve@reevelaw.net*

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| R.12 Amended Complaint | PageID # 82-90 |
|---|---|
| R.24 Stipulation and Motion for Partial Motion to Dismiss | PageID # 114-117 |
| R.25 Order Granting Motion | PageID # 118 |
| R.26 Deposition of SeMa'j Griffin | PageID # 146-49, 152-53, 166-67, 170-71, 184, 192, 202-03, 228-34, 236-43, 255, 259, 264, 270, 272-74, 276, 283-84, 295-96, 323 |
| R.26-1 Jnt. Dep. Ex. 1-1 | PageID # 537-58, 559-65 |
| R.26-2 Jnt. Dep. Ex. 1-2 | PageID # 774 |
| R.26-3 Jnt. Dep. Ex. 1-3 | PageID # 912-13, 917 |
| R.27 Deposition of George Koukourakis | PageID # 1069-73, 1078, 1084-88, 1091, 1097-99, 1102 |
| R.28 Deposition of Sally Souvannavong | PageID # 1142-43, 1145-46, 1158-60, 1166-67 |
| R.29 Deposition of Michael Swiggum | PageID # 1189-90, 1192-1203, 1205-07, 1209-12, 1217-21, 1231, 1234, 1238-43, 1246-48 |
| R.31 Deposition of Colonel Payne | PageID # 1302, 1305, 1307, 1309-12, 1314-15 |
| R.31-1 Jnt. Dep. Ex. 6 | PageID # 1324-86 |
| R.37 Memorandum Opinion and Order | PageID # 1573-92 |
| R.38 Judgment Entry | PageID # 1593 |

| | |
|---|---|
| R.39 Notice of Appeal | PageID # 1594 |